**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT THOMAS, SCOTT PATRICK** | ) | |
| **HARRIS, MICHAEL BELL, SANDRA** | ) | |
| **PALUMBO, FRANK KARBARZ, and** | ) | |
| **THOMAS DAVIS on behalf of themselves** | ) | **Case No: 13 CV 7747** |
| **and all others similarly situated,** | ) | |
| | ) | **Hon. Sara L. Ellis** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LENNOX INDUSTRIES INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PRELIMNARY APPROVAL OF THE CLASS SETTLEMENT**

**I.      INTRODUCTION**

Plaintiffs, on behalf of themselves and all other members of the proposed settlement class, respectfully submit this memorandum in support of their motion for an order granting preliminary approval of a settlement agreement ("Settlement Agreement") with Lennox Industries Inc. ("Lennox" or "Defendant").  To facilitate the Settlement, Plaintiffs also ask the Court to provisionally certify a settlement class (the "Settlement Class"), appoint Plaintiffs as the Settlement Class representatives, appoint Interim Class Counsel Jonathan Shub of Kohn, Swift & Graf, P.C. and Jeffrey Leon of Quantum Legal LLC as Lead Settlement Class Counsel, direct dissemination and publication of notice to the members of the Settlement Class (the "Notice"), and set a schedule for a fairness hearing on final approval of the Settlement.

This litigation concerns uncoated copper evaporator coils manufactured by Lennox ("Coil" or "Coils") and installed in Settlement Class Members' homes as part of their air conditioning systems.  On behalf of a putative national class, Plaintiffs allege that the Coils are defective because they are susceptible to formicary corrosion (the result of a chemical reaction

1

requiring copper, oxygen, water, and organic acids) that causes the Coils to leak refrigerant. Lennox denies all of the Plaintiffs' claims and allegations. Lennox maintains that the occurrence of formicary corrosion is rare, and when it does occur, it is typically the result of unique concentrations of various chemicals found and used in individual homes, including construction materials and household cleaners.

After considerable discussions, negotiations, mediation sessions, information exchanges and confirmatory discovery, Plaintiffs and Lennox have entered into the Settlement Agreement to resolve the claims of Plaintiffs and the Settlement Class. As Plaintiffs have investigated their case, they have recognized that there are obstacles to certification and to success on the merits, including issues of proof, causation, and damages. Although Plaintiffs do not view any of these obstacles as insurmountable, the Settlement provides nationwide class relief proportionate to the strength and weaknesses of their claims.

The Settlement provides all Settlement Class Members with relief, on a claims-made basis, in the form of an Expanded Warranty and Reimbursement Program that provides coverage should a Coil leak occur.[1] Dispensing with the requirement to prove the cause of the leak, the Settlement (i) defrays part of the costs of required maintenance or service of Settlement Class Members' air-conditioning systems, and (ii) provides added protection in the event Settlement Class Members experience multiple Coil failures.

In particular, the Expanded Warranty and Reimbursement Program includes: (1) a one-time $75 service rebate to help defray the cost for future service or maintenance on the system; (2) an aluminum or coated copper replacement Coil after the first replacement; (3) up to $550 as reimbursement for labor and refrigerant charges for each replacement after the first replacement;

_____

[1] A copy of the Settlement Agreement with the exhibits to the Settlement Agreement is attached as Exhibit 1 hereto. Exhibits to the Settlement Agreement that are referenced herein are identified by their Settlement Agreement exhibit number (e.g., SA Ex. [ ]).

and (4) up to $550 as a retroactive reimbursement for labor and refrigerant charges for the first replacement of the original Coil in the event there are repeat failures.

Plaintiffs believe that these benefits are commensurate with the merits of and challenges to their claims and thus that the Settlement is adequate, fair and reasonable Accordingly, Plaintiffs respectfully submit that preliminary approval of the Settlement and provisional certification of the Settlement Class is appropriate.

## II.    BACKGROUND

### A.    Evaporator Coils and Formicary Corrosion

Lennox manufactures consumer central air-conditioning systems that it sells to third-party distributors or dealers nationwide.  Lennox does not sell directly to homeowners and Lennox does not install its products in any home nor does it service its products (e.g., diagnose issues when an air-conditioning system is not functioning properly or install replacement parts).

Among other things, Lennox manufactures evaporator coils.  An evaporator coil is a part of an air-conditioning system or a heat pump system in the cooling mode.  The evaporator coil is located inside the house and its primary function is to remove heat from the air.  Lennox sells evaporator coils separately, as part of an air handler, or as part of a packaged unit, under various brands.[2]  The evaporator coil typically consists of copper tubing to which are affixed aluminum fins.  Those fins transfer heat from the air passing over the copper tubing to the refrigerant inside the tubing.  This heat exchange results in the cooling of the warm air inside the house.  Lennox has traditionally used copper (rather than alternative metals such as aluminum) for the tubing. Lennox does sell some evaporator coils with aluminum tubing.  With the introduction of additional models, that percentage is expected to increase in the future.  Lennox maintains that there are advantages and disadvantages to both copper and aluminum.

---

[2] The brands are: Lennox; Air-Flo; Armstrong; AirEase, Ducane; and Concord.

Formicary corrosion is a phenomenon that can affect copper tubing. Aluminum tube evaporator coils are not subject to formicary corrosion. Formicary corrosion results from a chemical reaction between copper, oxygen, water, and certain organic acids. Those organic acids derive from volatile organic compounds ("VOCs"), which are emitted from various household products and building materials, including oil based paints, foam insulation, carpeting, wallpaper, vinegar, cosmetics, and cleaning solvents. Formicary corrosion is difficult to detect because the tiny pinholes it produces are not visible to the naked eye. Thus, its presence can only be confirmed through expensive, destructive testing on a Coil after it has been removed from the system. That said, multiple failures in the same home may indicate the possibility of the existence of environmental conditions that create a risk of formicary corrosion.

The Lennox manufacturer's limited warranty covers evaporator coils for five years from the date of installation. Some models are covered by or eligible for a ten-year warranty. The manufacturer's warranty is a parts only warranty and expressly limits the remedy for any defective part to a free replacement part. Labor, which is the responsibility of the dealers, is excluded. The warranty also expressly excludes coverage for corrosion and further excludes all implied warranties and any other express warranties. Generally, under the warranty, if an uncoated copper Coil leaks, it is replaced with another uncoated copper Coil. With the introduction of new aluminum tube evaporator coils for sale, Lennox is beginning to offer dealers an option of copper or aluminum when replacing an evaporator coil under warranty. That choice, however, is currently limited to certain models and is subject to supply and, therefore, is not guaranteed.

**B.  Allegations in the Complaint and Procedural History**

Plaintiff Robert Thomas, on behalf of himself, a nationwide class, and a subclass of Illinois purchasers, filed the original Complaint on October 29, 2013. On January 14, 2014, Plaintiffs filed an Amended Complaint that added the other five named plaintiffs and sought to represent subclasses from their respective states: California, Florida, Pennsylvania, South

Carolina, and Texas. The Complaint alleges that Lennox Coils are defective because they are made of uncoated copper and thus are susceptible to formicary corrosion, which can cause the Coils to leak. For the air conditioning system to function properly the leaking Coils need to be replaced. Although the manufacturer's limited warranty covers the replacement Coil itself, it does not cover the costs of labor and refrigerant to install the replacement Coil.[3] Because of the likely underlying causes of formicary corrosion (namely, high concentrations of VOCs in an individual home), some homeowners may have to replace defective Coils more than once, incurring additional replacement costs each time. Replacement Coils are not provided with any separate warranty; instead, warranty coverage for a replacement Coil is limited to whatever period of time (if any) remains on the manufacturer's limited warranty for the original Coil.

The Complaint further alleges that Lennox knew, or had reason to know, of copper's susceptibility to formicary corrosion and that it failed to notify homeowners of the problem or to provide adequate warranty service to its customers. Further, Plaintiffs allege that homeowners paid a price premium for the Coils and that their purchases are of diminished value because they may require costly repair. Thus, the putative class includes Coil purchasers, even where no leak has occurred. The Complaint asserts claims for breach of express and implied warranty (including challenges to the validity of the warranty exclusions for labor), fraudulent concealment, and unjust enrichment along with claims based on alleged violations of multiple state consumer protection statutes, and seeks declaratory, compensatory and other forms of relief.

Lennox filed its Answer to the Amended Complaint on March 28, 2014, denying Plaintiffs' allegations. On April 3, 2014, the Court entered a scheduling order that, among other things, established a May 15, 2015 deadline for Plaintiffs' motion for class certification. On

---

[3] Labor costs for replacement within the first year of installation of the original Coil are generally covered by the dealer in accordance with industry practice. In addition, some homeowners choose to purchase from a dealer an extended warranty beyond the manufacturer's limited warranty, some of which include coverage for labor or refrigerant.

April 23, 2014, the Court appointed Jonathan Shub of Kohn, Swift & Graf, P.C. (formerly of Seeger Weiss LLP) and Jeffrey Leon of Quantum Legal LLC (formerly Complex Litigation Group) as Interim Class Counsel.

Around the time the Court established the pretrial schedule and appointed Interim Class Counsel, the parties began what has now been more than a year of exchanges of information, discussions, negotiations[4] and mediation.[5] In addition, Interim Class Counsel have continued their independent investigation, including engaging the services of an expert and researching available literature on formicary corrosion. The entire process has been arm's-length and, indeed, adversarial at times.

After the final mediation session, on January 7, 2015, Defendant circulated to Interim Class Counsel a Term Sheet providing the framework for negotiation of the Settlement Agreement. On January 14, 2015, the parties notified the Court that they had tentatively agreed to settle this litigation. From then on, the parties worked diligently to negotiate and prepare the Settlement Agreement and conduct confirmatory discovery. The parties also retained a settlement administrator to prepare and disseminate the Notice. Several extensions were required to complete these tasks and to prepare and file the instant Motion for Preliminary Approval of the Settlement.

C. **The Parties' Contentions**

Defendant has always vigorously denied that the Coils are defective. Defendant maintains that the majority of the putative class has not and never will experience a leak due to formicary corrosion or any other reason. According to literature cited by Plaintiffs in their complaint, it is estimated that formicary corrosion is responsible for approximately 10% of early

---

[4] There were in-person settlement negotiations on April 3, 2014 and October 13, 2014.

[5] There were three mediation sessions before the Honorable Richard Neville, on May 16, 2014, June 3, 2014, and August 26, 2014. A fourth and final mediation session was held on December 22, 2014 before the Honorable Edward Infante.

copper coil failures. Lennox estimates (based on a cumulative five-year weighted average) that the warranty claim rate for its evaporator coil leaks (due to any cause, including causes that have nothing to do with the coil, such as improper installation by dealers) is approximately 5.5%. Accordingly, Lennox approximates that, even using Plaintiffs' sources (which Lennox contends overstate the incidence of formicary corrosion), formicary corrosion would impact less than 0.6% of all of the Coils it sells. Lennox maintains that figure is consistent with data it has provided to Plaintiffs showing that the incidence rate of repeat Coil failures, which may tend to indicate an environmental issue that might implicate the possibility of formicary corrosion, is even lower. Defendant also maintains that, in addition to being rare, formicary corrosion is not visible to the naked eye and thus cannot be positively identified without expensive, destructive laboratory testing on a Coil after it has been removed from the home. As a result, Defendants contend that Plaintiffs will face significant hurdles attempting to prove their case. Moreover, because formicary corrosion is caused by high concentrations of VOCs emitted from household products and building materials, combined with high humidity, Defendant argues that formicary corrosion is not the result of an alleged defect, but rather depends on the individual circumstances and actions of each homeowner. Therefore, Defendant contends, individual issues would predominate if this case were to go to trial. In addition, Defendant challenges the viability of Plaintiffs' warranty claims, given that the manufacturer's limited warranty expressly excludes coverage for corrosion and labor costs. For these and other reasons, Lennox asserts that Plaintiffs will be unable to demonstrate that a class may be certified and, even if one were, that Plaintiffs will be unable to prove the merits of their claims. Defendant nevertheless wishes to avoid the uncertainties, burden and expense of continued litigation and wishes through the Settlement to put to rest the claims of Plaintiffs and the Settlement Class. Furthermore, Lennox asserts that it would rather find ways to assist and support its customers regarding this rare issue, than expend substantial time and money on litigation.

Plaintiffs vigorously disagree with Defendant. After studying relevant literature, retaining and consulting with experts, reviewing publicly available data, reviewing data supplied by Lennox, and taking the deposition of the Vice President and General Manager of Lennox's residential business, Plaintiffs contend that the case meets the requirements for certification as a class action and that their claims have merit. Plaintiffs also believe that all uncoated copper Coils are defective insofar as they are all susceptible to formicary corrosion. However, Plaintiffs acknowledge that there are obstacles to certification and success on the merits, including the low incidence of formicary corrosion, the difficulty in proving formicary corrosion in any given case, challenges to causation, and the potential number and significance of individual issues. Accordingly, Plaintiffs believe it is in the best interests of the putative class to settle this litigation on meaningful terms that provide Settlement Class Members with relief proportionate to the risk of experiencing a Coil leak due to formicary corrosion, rather than assume the uncertainties of proceeding to trial.

III.    THE SETTLEMENT

The Settlement creates an Expanded Warranty and Reimbursement Program (the "Program"). The Program is designed to provide labor reimbursements and expanded warranty coverage for those homeowners whose Coils may have leaked due to formicary corrosion and protection against future leaks. The Program consists of a rebate program, a replacement Coil warranty, and a reimbursement program.

The Program is necessarily over-inclusive because Lennox will not require homeowners to actually prove that their Coil leaked due to formicary corrosion. Such testing is costly, burdensome, and destructive in nature, and thus would prove unworkable for Lennox and the Settlement Class. Alternatively, the Program relies on a proxy for determining which homeowners may have formicary corrosion issues, namely those who experience a repeat failure

(as multiple failures in the same home may indicate the possibility of the existence of environmental conditions that create a risk of formicary corrosion).[6]

All Settlement Class Members are eligible for coverage under the Program. The Settlement Class includes U.S. residents who purchased and installed in their home at least one new uncoated copper tube Lennox, Aire-Flo, Armstrong Air, AirEase, Concord, or Ducane brand evaporator coil ("Original Coil"), on or after October 29, 2007, up to the date on which the Court enters an order preliminarily approving the Settlement Agreement (the "Preliminary Approval Date"), regardless of whether the Coil was purchased separately or as part of an air handler or packaged unit. The Program covers purchases made for up to six years prior to the initiation of the lawsuit, which is fair and reasonable in light of the statute of limitations issues that would otherwise limit claims for relief.

To receive any benefits the Settlement Class Member must be an Authorized Claimant by virtue of having submitted a timely and valid Claim Form. Each Authorized Claimant will receive a certificate (the "Certificate") describing the benefits and rights under the Program and providing instructions about when and how to redeem and obtain such benefits. A claims-made settlement is necessary here because Lennox does not sell its products directly to homeowners. As a result, Lennox has no way of identifying the majority of Settlement Class Members except those who have filed a warranty claim or registered their product.

As noted above, when a Coil leaks, consumers are entitled to a free replacement coil under the manufacturer's limited warranty. Historically, an uncoated copper Coil has been replaced with another uncoated copper Coil. Although Lennox has begun introducing the option

---

[6] There is one exception to the two-leak proxy. As explained below, Settlement Class Members are eligible for a rebate after their first Coil replacement. This accounts for the extremely low incidence of repeat Coil failures as well as the fact that some Settlement Class Members may receive an aluminum tube coil as their first replacement. The other benefits, including reimbursement for labor and refrigerant charges and an entitlement to an aluminum or coated copper tube Coil, require at least two Coil replacements.

of choosing either a copper or aluminum replacement coil regardless of the type of evaporator coil being replaced, the option is currently limited to certain models, subject to supply, and thus is not guaranteed. The manufacturer's limited warranty does not cover the costs of labor or refrigerant and the coverage period does not restart when a coil is replaced. The Program provides several additional benefits not available to non-Settlement Class Members as follows:

(1)     $75 Service Rebate.  Authorized Claimants who replace or have replaced their Original Coil because of a Coil leak within five years after it was installed are eligible for a one-time $75 rebate certificate for service, including routine maintenance, performed after the date the rebate certificate is issued, on the replacement coil or any Lennox brand, Aire-Flo brand, Armstrong Air brand, AirEase brand, Concord brand, or Ducane brand HVAC products installed in the same residence as the replacement coil. When the rebate certificate is redeemed, it entitles the Settlement Class Member to a $75 check from Lennox.

Routine maintenance is required under the terms of the original manufacturer's limited warranty to preserve that warranty and helps prevent and identify problems before a Coil fails. Thus, the rebate is intended to promote preventative maintenance and defray part of the costs the homeowner should already be incurring; it does not encourage additional spending. Moreover, because maintenance or service is performed by independent dealers, Lennox will not earn revenue or otherwise gain any benefit when Settlement Class Members obtain service.

(2)     Replacement Coil Warranty.  Authorized Claimants who, within five years after the Original Coil was installed,  replace or have replaced it with an uncoated copper tube replacement Coil because of a Coil leak are eligible for a five-year part and labor warranty on the replacement Coil (the "Replacement Coil Warranty"). If the Authorized Claimant had more than one replacement on or before the Preliminary Approval Date, each using an uncoated copper tube replacement Coil, the Replacement Coil Warranty covers the most recent replacement Coil. If the covered replacement Coil leaks and requires replacement within the five-year period of the Replacement Coil Warranty, the Authorized Claimant is entitled to receive a coated copper tube

replacement coil or an aluminum tube replacement coil, and reimbursement for the costs of labor and refrigerant to install that replacement coil up to $550.

The Replacement Coil Warranty is five years, which is consistent with standard warranties in the industry. However, unlike standard warranties that run from the installation of the Original Coil, the Replacement Coil Warranty provides additional coverage as it runs for up to five years from the installation of the covered replacement Coil. The Replacement Coil Warranty also covers labor and refrigerant charges and guarantees, under the terms of the Settlement, a coated copper or aluminum tube coil, both of which are resistant to formicary corrosion. The $550 reimbursement amount exceeds the high range of labor coverage offered in Lennox's Complete Care Plus Warranty, an optional extended warranty sold by dealers to consumers. Although in some cases this amount likely will not cover the full amount of labor and refrigerant charges incurred to install the replacement coil, Settlement Class Members are not required to undertake the expensive and time-consuming burden of having to prove that the Coil failure was, in fact, caused by formicary corrosion.

(3)     Reimbursement for Replacements after the First Replacement.  Authorized Claimants who had more than one replacement on or before the Preliminary Approval Date, are eligible to receive reimbursement for the costs of labor and refrigerant for each uncoated copper tube Replacement Coil that was replaced, up to $550 per replacement.

(4)     Retroactive Reimbursement for the First Replacement.  Authorized Claimants who replace or have replaced their Original Coil for the first time more than one year after the date of installation and received an uncoated copper tube replacement Coil, and who replace that replacement Coil, will be eligible to be reimbursed up to $550 for the costs of labor and refrigerant for the replacement of the Original Coil. In accordance with industry practice, dealers generally cover labor for replacements during the first year.

Because the lawsuit concerns allegations of premature failure of purportedly defective Coils based on formicary corrosion, the actual benefits to which a Settlement Class Member is or

11

may become entitled is keyed to the replacement of one or more Coils. Likewise, the mechanics of the claims submission and administration process, including submission deadlines, is keyed to replacement Coil installation dates and will vary among Settlement Class Members. Claims must be submitted by the later of 60 days after the final approval hearing or 60 days after the Settlement Class Member's Original Coil is replaced, and further requests for benefits may be submitted thereafter. As a result, the Program may be in place for as long as ten years for certain Settlement Class Members.[7]

There is no cap on the number of claims Lennox will accept or the amount of money it will expend to satisfy all timely and valid claims. It is difficult to predict the number of expected claims for two reasons. First, Lennox has no way to know of a Coil failure unless it is reported to Lennox, typically by way of a warranty claim, by either the homeowner or the dealer. Second, the Program covers future Coil failures that might occur over the course of the next ten years. That said, given the historical Coil failure rates for one-time and repeat Coil failures, Lennox expects that less than 6% of the Settlement Class has or will experience at least one Coil failure and less than 1% will experience repeat Coil failures. Nevertheless, the Program provides extended coverage to all Settlement Class Members.

As part of the Settlement, Lennox has also agreed to publish information on its website about the possible risk under certain conditions of formicary corrosion in uncoated copper tube Coils. Lennox has also undertaken to pay the reasonable and necessary costs of the Notice Plan and Claims Administration process, including the Notice Expert and Settlement Administrator's fees. Lennox has also agreed not to object to an award of Class Counsel's fees and expenses (subject to a cap, discussed below).

---

[7] For example, if a homeowner purchases an Original Coil on the Preliminary Approval Date, and if that Original Coil is first replaced with an uncoated copper Coil five years after installation, the replacement Coil would be covered for up to five years under the Replacement Coil Warranty.

**IV.     NOTICE AND CLAIMS PROGRAMS**

The Notice Plan and Claims Administration Plan (SA Exs. A and B), will be administered by a Notice Expert and Settlement Administrator appointed by the Court.  Plaintiffs and Defendant jointly move the Court to appoint Kurtzman Carson Consultants LLC, a highly qualified and experienced firm expert in the administration of class action notice and claims programs, as both Notice Expert and Settlement Administrator.  See Declaration of Gina M. Intrepido-Bowden and its attachments, attached as Exhibit 2 hereto.

**A.   Notice Plan**

The Notice Plan (SA Ex. A) calls for several forms of notice, intended to maximize the probability of reaching all or substantially all Settlement Class Members.  The forms of notice include, but are not limited to:

a.      direct U.S. first class mail notice using a Postcard Notice (SA Ex. A-3) to all persons that Defendant and Plaintiffs have through reasonable efforts identified as falling within the Settlement Class definition and for whom postal addresses may reasonably be obtained.  Although Defendant does not sell directly to homeowners, it maintains a warranty registration database[8] and warranty claims database that Plaintiffs, Defendant and the proposed Notice Expert believe contains the requisite information for approximately one third of the Settlement Class.

b.      Notice by publication in appropriate print or other media using a Summary Notice (SA Ex. A-2).

_____

[8] Registration is not required to activate the manufacturer's limited warranty. Registration is required on some models to obtain the manufacturer's extended limited warranty.

      c.      Online notice, including both a dedicated Settlement Website, which will include access to a Long-Form Notice (SA Ex. A-1), and information about the Settlement on Lennox's website, with a link to the Settlement Website.

      d.      Communication about the Settlement by email or online portal from Lennox to Lennox independent dealers, who sell and service the Coils and, therefore, interface directly with the Settlement Class Members.

      e.      An automated telephone hotline maintained by the Settlement Administrator, providing information concerning the Settlement, the web address for the Settlement Website, and a means to order copies of the Long-Form Notice and other Settlement related documents.

      f.      Notice to appropriate government officials, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715.

The Notice Plan calls for Notice to be given to the Settlement Class within 50 days of the Court's entry of a Preliminary Approval Order, or as soon thereafter as practicable. The Notice Expert, who along with Plaintiffs and Defendant will be responsible for providing Notice, will use the Postcard Notice as well as both the Long-Form Notice and the Summary Notice (SA Exs. A-3, A-1, and A-2). No less than seven days prior to the fairness hearing, the Notice Expert will file with the Court an affidavit or declaration as proof that the required notice was disseminated to the Settlement Class, so that the Court has time to evaluate the Notice Plan prior to hearing argument in support of or opposition to final approval of the Settlement.

The Notice will provide Settlement Class Members with information on how, when and where they may object to the Settlement. The Notice will also provide instructions on how to opt-out of the Settlement, including a deadline for doing so. The Parties propose an objection and opt-out deadline of 35 days prior to the final approval hearing, which provides Settlement Class Members adequate time to consider the terms of the Settlement and make their decision, while also affording sufficient time for the Parties' Counsel to respond, in the case of objections, and

the Settlement Administrator to compile a report for the Court setting forth the total number of opt-outs along with their names and addresses.

**B. Claims Process**

The Administration Plan (SA Ex. B) provides for a reasonable and customary claims process under the supervision of the Court. The Court-appointed Settlement Administrator will be responsible for administering all claims and requests for benefits under the Program for the first phase of the claims process (i.e., all claims and requests for benefits submitted by 60 days after the final approval hearing). Because the Program could remain in effect for up to ten years, the second phase of the claims process will be administered by Lennox (i.e., all claims and requests for benefits submitted after the end of the first phase), always under the supervision of Class Counsel and subject to the Court's continuing jurisdiction.

As detailed in the Administration Plan, in order for a Settlement Class Member to receive any benefits under the Expanded Warranty and Reimbursement Program, the Settlement Class Member must be an Authorized Claimant by virtue of having submitted a timely and valid Claim Form within the claims period. The deadline for filing a Claim Form is keyed off each Settlement Class Member's first Coil replacement. In particular, Claim Forms must be submitted by the later of 60 days after the final approval hearing or 60 days after the Settlement Class Member's Original Coil is replaced. The claims period is intended to provide flexibility. Thus, Settlement Class Members can file a Claim Form before they ever experience a leak if they choose, but will not be obligated to do so until after they have replaced their Original Coil. A Settlement Class Member need only submit a Claim Form once for any claims based on any particular Original Coil purchased by the Settlement Class Member. Submission of the Claim Form also serves as a request for benefits that the Settlement Class Member may be eligible to receive as of the time the Settlement Class Member submits the Claim Form. Each Authorized Claimant will receive the Certificate describing the benefits and rights under the Program and providing instructions about when and how to redeem and obtain such benefits.

15

To redeem and obtain benefits under the Program for which an Authorized Claimant first becomes eligible after submission of their Claim Form, the Authorized Claimant must complete and submit follow-up Request for Benefits Forms, as explained in the Certificate, with information and supporting documentation that were not already included in the Claim Form. The Certificate will also contain a toll-free number to call, when eligible under the Replacement Coil Warranty, to arrange to receive an uncoated copper tube or aluminum tube replacement Coil.

Claim Forms and Request for Benefits Forms will be made available through several means, including: (1) by making a request through an automated toll-free telephone number established to provide information about the Settlement; (2) by mailing a request to a designated postal address; and (3) by downloading from the Settlement Website. Settlement Class Members will have the option of either mailing completed Claim Forms and Request for Benefits Forms (along with supporting documentation, such as proof of purchase or installation date as applicable), or filling out online versions of these forms and either uploading or mailing any required supporting materials to the Settlement Administrator.

The Settlement Agreement establishes procedures and criteria to protect the due process rights of all Settlement Class Members. Those procedures include specific steps for determining the validity of claims; a process for notifying Settlement Class Members of curable deficiencies and affording them the opportunity to correct errors and omissions; the right for Parties' Counsel, upon agreement, to waive technical defects or formalities if they determine that doing so would achieve substantial justice; and a process for rejected Claimants and Class Counsel to challenge denials of Claims. Unresolved disputes may be presented to the Court. Submission of a Claim Form will constitute consent to the Court's jurisdiction over the claim and the Claimant, and the Court's decisions on disputed claims will be deemed final and conclusive as to the Settlement Class Members.

**V.      ARGUMENT**

Federal Rule of Civil Procedure 23(e) governs class action settlements. There is a well-accepted procedure and specific criteria for preliminary and final approval of class action settlements. *See Manual for Complex Litigation* (Fourth) (2004) § 21.63 (describing a three-step procedure for approval of class action settlements consisting of preliminary approval, notice and a final hearing).

For purposes of preliminary approval, "the court's task is merely to determine whether the proposed settlement is within the range of possible approval, not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, *6 (N.D. Ill. July 26, 2011) (quotation omitted); *see also In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 416 (S.D. Ind. 2001). The Court's function is simply "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010) (same). Notice is the linchpin of due process in the settlement of a class action, affording every class member the opportunity at (or prior to) a fairness, or final approval, hearing to object to class certification, the notice program, and the settlement. With the benefit of that input, the Court exercises its independent judgment and decides whether the settlement is fair, adequate and reasonable in light of all the circumstances of the action. Then, and only then, may the Court enter an order of final approval of the settlement.

In advance of the fairness hearing, and on motion of the parties, the district court will thus consider whether to:

1. Provisionally certify the class;

2. Make preliminary findings as to the fairness, adequacy and reasonableness of the settlement agreement;

3.  Order dissemination of notice of the proposed settlement and the rights and obligations of class members with respect to that settlement; and

4.  Appoint Class Counsel and Class Representatives.

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir.1996). Indeed, "[i]t is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement." *Armstrong*, 616 F.2d at 312-13 (quotations omitted); *see also Hispanics United of DuPage County v. Village of Addison*, 988 F. Supp. 1130, 1149 (N.D. Ill. 1997) ("Compromise is particularly appropriate in complex class actions."). Evaluations of fairness, reasonableness and adequacy require that the facts be viewed in a light most favorable to the settlement. *Isby*, 75 F.3d at 1199.

### A.  <u>The Court Should Provisionally Certify the Class</u>

"Before addressing the substantive provisions of the Settlement Agreement, the [C]ourt must first determine whether the proposed class can be certified" for settlement purposes. *Kaufman v. American Exp. Travel Related Services Co., Inc.*, 264 F.R.D. 438, 441-42 (N.D. Ill. 2009) (*citing In re Bromine Antitrust Litig.*, 203 F.R.D. 403). Class certification is an exercise of judicial discretion, and "[t]he fact that the parties have reached a settlement is a relevant consideration in the class-certification analysis." *Zolkos v. Scriptfleet, Inc.*, No. 12-Civ-8230 (GF), 2014 WL 7011819, *1 (N.D. Ill. Dec. 12, 2014) (*citing Smith v. Sprint Communications Co.*, 387 F.3d 612, 614 (7th Cir. 2004)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.").

Plaintiffs request that the Court certify for settlement purposes only, under Federal Rule of Civil Procedure 23(a) and 23(b)(3), a Settlement Class, defined as:

> All Persons who are residents of the United States and who purchased on or after October 29, 2007 through the Preliminary Approval Date at least one uncoated copper tube Lennox brand, Aire-Flo brand, Armstrong Air brand, AirEase brand, Concord brand, or Ducane brand evaporator coil (separately, as part of an air handler, or as part of a packaged unit), for their personal, their family, or their household purposes, that was purchased new, covered by an original warranty when purchased, and installed in a house, condominium unit, apartment unit, or other residential dwelling located in the United States.

Although when presented with a request to preliminarily approve a proposed class settlement a court's evaluation may be more relaxed than when considering entry of a final order binding all class members to the settlement's terms, the Court must nevertheless determine whether the proposed settlement class satisfies Rule 23's requirements. As demonstrated below, no reason exists to refrain from provisionally certifying for settlement purposes the proposed Settlement Class.[9]

The first step in evaluating an application for class certification is to decide whether the proposed class meets the four prerequisites of Rule 23(a): numerosity; commonality; typicality; and adequate representation. Each of these factors weighs in favor of provisionally certifying the Settlement Class.

**Rule 23(a)(1)**. The first requirement asks whether the proposed class is so numerous that joinder is impracticable. Although the Rule provides no firm number, courts have held that numerosity can be satisfied where more than 40 putative class member exist. *See, e.g.*, *Flood v. Dominguez*, 270 F.R.D. 413, 417 (N.D. Ind. 2010) ("Generally speaking, when the putative class consists of more than 40 members, numerosity is met[.]"); *Muro v. Target Corp.*, No. 04-6267, 2005 U.S. Dist. LEXIS 14409, at *39 (N.D. Ill. July 15, 2005) ("Permissive joinder is usually deemed impracticable where the class members number 40 or more."). Lennox has sold millions of Coils during the relevant period, including approximately three million units under the six

---

[9] The Parties seek certification for settlement purposes only. Defendant takes no position at this time concerning certification of a litigation class, reserves all rights, and does not waive any defenses or objections in opposition to a litigation class.

residential brands at issue in this litigation. This number significantly exceeds those found sufficient in innumerable other cases and, accordingly, Rule 23(a)(1)'s numerosity requirement is met.

**Rule 23(a)(2)**. The next question is whether there are questions of law or fact common to the class. "Commonality requires that there be at least one question of law or fact common to the class." *Barragan v. Evanger's Dog & Cat Food Co.*, 259 F.R.D. 330, 334 (N.D. Ill. 2009) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). Here, common issues for the Settlement Class include, for example: whether Coils are susceptible to formicary corrosion; whether Coils can fail because of formicary corrosion; what the rates of failure are for Coils; what percentage of those failures is attributable to formicary corrosion; whether Lennox knew or knows its uncoated copper evaporator coils are susceptible to formicary corrosion; whether Lennox took any measures to mitigate the risk of formicary corrosion in its evaporator coils. Given that Plaintiffs need only show one common question of law or fact to establish commonality under the rule, *see Barragan*, 259 F.R.D. at 334, Plaintiffs satisfy the commonality requirement for the Settlement Class.

**Rule 23(a)(3)**. A "'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the same legal theory.'" *Rosario v. Livaditis*, 963 F. 2d 1013, 1018 (7th Cir. 1992) (*quoting De La Fuente v. Stokely-VanCamp, Inc.*, 713 F. 2d 225, 232 (7th Cir. 1983)). Rule 23(a)'s typicality requirement should be "liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009). So long as "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," typicality is satisfied. *Id.* (citation omitted); *see also Owner-Operator Indep. Drivers Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005) (typicality is a "low hurdle" requiring "neither complete coextensivity nor even substantial identity of claims."). Rule 23(a)(3) "'primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of

20

the class at large.'" *Muro v. Target Corp.*, 580 F. 3d 485, 492 (7th Cir. 2009) (*quoting De La Fuente*, 713 F. 3d at 232)).

Here, the claims of Plaintiffs and the Settlement Class all arise out of Defendant's practices with respect to the manufacturing and warranty of uncoated copper evaporator coils. Plaintiffs' legal theories include breaches of express and implied warranties, and they also seek, among other things, a declaration that the Coils are defective, that Lennox has a duty to notify all Coil owners of the defect, and that Lennox must pay for inspection of all Class members' Coils to determine whether any need to be replaced. Plaintiffs' claims are "typical" of those of the Settlement Class. *Saltzman*, 257 F.R.D. at 479; *In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 233 (E.D. Pa. 2012).

**Rule 23(a)(4)**. The requirement that "the representative parties . . . fairly and adequately protect the interests of the class . . . serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods.*, 117 S.Ct. at 2250. This requirement "tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id*. at 2251 n. 20. Because of the unique nature of the class action device, "[t]he adequacy-of-representation requirement 'is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members.'" *In re AT&T Mobility Wireless Data Servs.*, 270 F.R.D. at 343 (*quoting Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)) (further internal quotations and citation omitted).

"A class representative must . . . 'be part of the class and possess the same interest and suffer the same injury as the class members.'" *In re AT&T Mobility Wireless Servs.*, 270 F.R.D. at 343 (*quoting Amchem Prods.*, 117 S.Ct. at 2245) (further internal quotations and citation omitted). "This requires the district court to ensure that there is no inconsistency between the

21

named parties and the class[,] . . . [because a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Id*. (internal quotations and citations omitted). In this case, there are no conflicting or antagonistic claims – the named plaintiffs' claims are consistent with those of the class. Neither the claims they have asserted in the Amended Complaint nor the terms of the Settlement afford any opportunity for preferential treatment. The named Plaintiffs' interests are aligned with those of all absent Settlement Class Members, and all members of the Settlement Class will have an equal opportunity to obtain benefits under the Program, based solely on the existence, number and timing of their Coil failure(s).

Likewise, Interim Class Counsel are adequately representing the interests of the Class. "Plaintiffs' counsel have invested substantial time and resources in this case by investigating the underlying facts, researching the applicable law, and negotiating a detailed settlement." *In re AT&T Mobility Data Servs.*, 270 F.R.D. at 344 (*citing Rand*, 926 F.2d at 598-99). Interim Class Counsel have consulted with experts, reviewed documents provided by Defendant and taken the deposition of Defendant's designated 30(b)(6) witness. Nothing they have learned has altered their view that the proposed Settlement is fair and reasonable.

While the information obtained by Interim Class Counsel was not produced in accordance with formal discovery procedures, formal discovery is not required for preliminary approval of a settlement, so long as there are factual bases on which to premise the settlement and so long as settlement negotiations have not prejudiced the interests of the Settlement Class. *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 WL 3070161, at *6 (E.D. Mich. Aug. 2, 2010) (*quoting Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004)). Indeed, the extensive use of mediators over the course of a year of investigation, information exchange and negotiations demonstrates both Interim Class Counsel's pursuit of the interests of the Class and their determination to avoid even an appearance of collusion with Lennox or any other party.

*McCue v. MB Financial, Inc.*, No. 15-cv-00988, 2015 WL 1020348, *2 (N.D. Ill. March 6, 2015) (*citing McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp.2d 806, 813 (E.D. Wis. 2009)).

In short, Plaintiffs and their counsel have demonstrated that they "are fully capable of litigating this case." *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 218 (M.D. Pa. 2012). Accordingly, the adequacy requirement is satisfied in this case.

**Rule 23(b)(3)**. Once Rule 23(a) is satisfied, Rule 23(b)(3) requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Certification of the Settlement Class is appropriate under Rule 23(b)(3) because the common questions of law and fact predominate over any individual questions, especially those that may arise in the context of the Settlement, and because a class action is the superior method of adjudicating the claims in light of the nature of the relief under the Settlement.

Whether the Coils are susceptible to formicary corrosion and whether formicary corrosion can cause leaks are questions that would be decided on a classwide basis. Likewise, whether and when Lennox knew the Coils were susceptible to formicary corrosion and what actions it took in response to this issue would be common to the class.

It is neither required nor expected that there are no individual questions, only that the common questions predominate. To be sure, there are some issues that are individualized and that are not suitable for class treatment. For example, determining whether any particular Coil failed due specifically to formicary corrosion would require an examination of the facts and circumstances around each leak, including the type of installation, the geographic location, the types of products used in the home, and the manner in which the air-conditioning unit was maintained. Similarly, determining whether the warranty was breached in any particular case will depend on the applicable state law, the circumstances of the Coil failure, the manner it which was reported, and the Defendant's specific response. Were this case proceeding to trial, the Parties

23

would argue whether these individual issues would necessitate countless mini-trials and render class treatment unmanageable. However, the Court need not take into consideration whether a potential trial would be manageable because Plaintiffs seek certification for settlement purposes only. *See Amchem*, 521 U.S. at 620. For purposes of the proposed Settlement, these individual issues are mooted.

Importantly, the Settlement does not require Settlement Class Members to prove the cause of their Coil leak or establish that the warranty was breached, and, therefore, questions of manageability fall away. Accordingly, Plaintiffs submit that, in the settlement context, the common factual and legal questions predominate and a class action is the superior mechanism for resolving the claims asserted and providing the Settlement Class with relief. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 n. 5 (7th Cir. 2012).

Because the requirements of Rule 23 are satisfied with respect to the Settlement, Plaintiffs respectfully request that the Court provisionally certify the proposed Settlement Class for settlement purposes only.

B. **The Settlement is Within the "Range of Reasonableness" for Preliminary Approval**

The question of whether a proposed settlement is fair, reasonable, and adequate necessarily requires an evaluation of "the strength of plaintiffs' case compared to the terms of the proposed settlement." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 346. This evaluation of the costs and benefits of settlement must be tempered, however, by the recognition that any compromise involves concessions on the part of all of the settling parties. Indeed, "[t]he essence of settlement is compromise." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

Turning first to the strength of Plaintiffs' case and the risks of continued litigation, it must be noted that Lennox has made clear that it will vigorously contest both class certification and liability should the case continue. Defendant contends that if the case were to go to trial, individual issues of proof and causation and the need to address the many differences in state warranty and consumer protection laws would make the case unmanageable and undercut the propriety of class certification. Even if a litigation class were certified, Lennox maintains that formicary corrosion is rare and, when it does occur, it is attributable to factors wholly outside Lennox's control, including environmental factors and the use by homeowners of various products and materials containing VOCs. Accordingly, Defendant's assert that the Coils are not defective, that the Settlement Class Members have suffered no economic loss due to the fact that the Coils are made of uncoated copper, and that the limitations and exclusions of the manufacturer's limited warranty are valid and fatal to Plaintiffs' claims.

Though Plaintiffs believe they have counterarguments to these issues and that their case has merit, complex litigation such as this is inherently risky, and there is a real possibility that Plaintiffs may not succeed. *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347. Here, Plaintiffs face extensive fact and expert discovery, class certification, summary judgment, potential *Daubert* motions, trial, and likely appeals of a successful trial verdict. Even if Plaintiffs were to win at every stage, continuing this litigation will necessarily delay recovery to the Class by several years or more. Settlement eliminates the risk of litigation, and provides valuable and certain relief to the Settlement Class now and for years to follow.

Shifting focus to the terms of the Settlement, an initial examination of those terms demonstrates that they are fair, reasonable, and adequate when balanced against the strength and weaknesses of Plaintiffs' case. Two of the significant hurdles Plaintiffs would face if the case were to go to trial are proving formicary corrosion is the cause of any particular leak and maintaining claims for the majority of Settlement Class Members who have not experienced and may never experience a leak, no matter what the cause. The Settlement accounts for and

addresses both of these issues, aligning the value of the Settlement with the potential outcome at trial.

First, the Settlement eliminates any need to determine on a case-by-case basis whether formicary corrosion was the cause of a Coil leak, as opposed to other possible causes, and thus makes every Settlement Class Member eligible for the Settlement's benefits without having to prove the actual cause of their evaporator coil's leak. However, as discussed above, because most leaks are the result of other causes, the Settlement adopts the concept of a two-leak proxy for several of the Settlement benefits.

Second, the terms of the Settlement expand the terms and benefits of the manufacturer's limited warranty coverage in ways that provide protection to all Settlement Class Members in the event they experience one or more Coil failures, including Settlement Class Members who will first experience a leak in the future. Thus, Settlement Class Members will receive benefits, but only if and when they actually experience a problem.

The Settlement benefits include, as applicable, a rebate for future maintenance or service, a replacement Coil warranty, an entitlement to an aluminum tube or coated copper tube Coil, and reimbursement for labor and refrigerant. Every Settlement Class Member who experienced or experiences an Original Coil failure at any time during the Original Warranty period is eligible for a $75 rebate toward service or maintenance by a Lennox independent dealer.

In addition, every Claimant who has experienced one or more Coil failures will receive an extended five-year warranty *on the replacement Coil itself* with an entitlement to an aluminum tube or coated copper tube Coil on the next replacement. This will, in many cases, result in warranty coverage for a replacement Coil exceeding the period of coverage available under the Original Warranty.

Furthermore, when a Settlement Class Member has experienced more than one Coil failure, they will be eligible to receive reimbursement of up to $550 for each replacement Coil installation and for the replacement of their Original Coil if the Original Coil was replaced more

than one year but less than five years from the original installation. Requiring multiple Coil failures before making certain of these remedies available is fair because very few Coil leaks are actually caused by formicary corrosion and, absent expensive laboratory analysis, the occurrence of multiple failures in the same home is a possible indication that the particular environment, and specifically formicary corrosion, may be the cause of those failures.

"[T]he stage of the proceedings" is another factor that courts consider in determining the fairness of a settlement to assess whether "the litigation had progressed to a point at which counsel and the court were fully capable of evaluating the merits of plaintiffs' case and the probable course of future litigation." *Armstrong*, 616 F.2d at 325. Plaintiffs and Lennox chose to settle only after Interim Class Counsel obtained from Lennox and analyzed documents and information, consulted with experts and conducted research, including a review of the literature on formicary corrosion. Although from the standpoint of pleadings and formal litigation proceedings this is an early stage in the litigation, "the absence of formal discovery is not an obstacle [to settlement approval], so long as the parties and the Court have adequate information in order to evaluate the relative position of the parties." *Int'l Union v. Ford Motor Co.*, No. 05-74730, 2006 WL 1984363, at *25 (E.D. Mich. July 13, 2006) *aff'd sub nom. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007); *see also Packaged Ice*, 2010 WL 3070161, at *6; *Sheick v. Auto. Component Carrier LLC*, No. 2:09-CV-14429, 2010 WL 4136958, at *19 (E.D. Mich. Oct. 18, 2010).

Furthermore, Interim Class Counsel's fact gathering has been conducted as part of the mediation process, which resulted in a framework for extensive, arm's-length, good-faith settlement negotiations. Additionally, and as a precondition to entering into the Settlement Agreement, Plaintiffs' Counsel required Lennox to provide confirmatory discovery, including not only production of internal documents from the company's business records, but also compilations of data Lennox does not generate or maintain in the ordinary course of its business. After the document production, a Lennox senior executive in charge of its residential air

27

conditioner business submitted to a deposition, testifying on the record as to the accuracy of that data and answering questions about, among other things, the company's evaporator coils business, formicary corrosion, and other causes of evaporator coil failures. There can be no question that Plaintiffs' Counsel have a clear view of the strengths and weaknesses of the Class's claims, against which they have been able to fully evaluate the fairness and adequacy of the Settlement. Overall, the Settlement was the result of more than one year of arm's-length and often adversarial interactions among experienced counsel, creating a presumption that the Settlement terms are fair, adequate, and reasonable. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arm's-length negotiation is presumed fair.").

In sum, the Settlement proposed is comfortably "within the range of possible approval[,]" *Armstrong*, 616 F.2d at 310, and is not obviously deficient.[10] At this juncture, the Court need not decide the ultimate question: whether the proposed Settlement is, in the Court's estimation, fair, reasonable, and adequate. *American Int'l Group, Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 U.S. Dist. LEXIS 84219, at *32-33 (N.D. Ill. July 26, 2011) (citing *Armstrong*, 616 F.2d at 314). Accordingly, at the preliminary approval stage, courts need not "conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards." *Id.* For all of the foregoing reasons, the Settlement warrants the Court's preliminary approval.

## C. **The Court Should Order Dissemination of Notice**

Rule 23 requires that notice of a settlement be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 8.2 at 162-65 (4th ed. 2002). In consultation with one of

---

[10] At final approval, Plaintiffs will submit expert evidence of the monetary valuation of the categories of settlement benefits.

the nation's preeminent Notice Experts and Settlement Claims Administrators, Kurtzman Carson Consultants LLC, Counsel have designed a Notice Plan intended to maximize the reach of a fully informative Notice to as many Settlement Class Members as is practicable given the finite temporal nature of a notice program and the need to balance efficiency and effectiveness so as to maximize the overall benefits of the Settlement across the widest number of Settlement Class Members. Counsel believe that the Notice Plan, in conjunction with the structure of the Settlement, will indeed maximize not only the number of Settlement Class Members who receive notice, but also the number of claims submitted by those homeowners.

As summarized above and detailed in the Notice Plan and accompanying documents (SA Exs. A, A-1, A-2, A-3, and A-4), as well as in the proposed Order Granting Preliminary Approval (SA Ex. C), Counsel and the Notice Expert propose to mail the Postcard Notice by first class mail to all persons identified from Defendant's warranty registration and claims data. In addition, Counsel and the Notice Expert will disseminate information regarding the Settlement on a Settlement Website, where Settlement Class Members can access documents of interest, as well as through Lennox's own website, which will provide Settlement information and a link to the Settlement Website. This effort will be complemented by an appropriate media campaign, and Lennox will also communicate information about the Settlement to its independent dealers.[11] This proposed notice program meets the requirements of due process because the proposed Notice alerts and informs members of the Settlement Class through means calculated to maximize the number of recipients of Notice.

The contents of the proposed Notice, and the proposed method of its dissemination, comport with Federal Rules of Civil Procedure 23(c)(2) and 23(e), as well as due process. *See generally Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-77 (1974) (due process is satisfied by

---

[11] Because its dealers are independently owned and operated businesses, Lennox can only inform them about the Settlement. Lennox has no contractual or other authority to require or compel them to assist in the notice effort.

mailed notice to all class members who reasonably can be identified); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 429 (S.D. Tex. 1999) (mailed notice to all class members whose address was known, and publication notice, satisfied due process and Rule 23).

          **D.  Interim Class Counsel Should be Appointed Class Counsel**

The court should also appoint Interim Class Counsel as Class Counsel and the named plaintiffs as Class Representatives. Interim Class Counsel have carefully steered the litigation into a significant and important settlement and the named plaintiffs have worked with Interim Class Counsel to ensure that the proposed settlement is fair, adequate and reasonable for the entire Class.

**VI.    CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court grant their motion for preliminary approval of the Settlement, provisionally certify, for settlement purposes only, the Settlement Class, appoint Class Representatives and Settlement Class Counsel, and order dissemination of the Notice to Settlement Class Members, in the form and manner described above and in accordance with the Notice Plan and other documents submitted as exhibits herewith. A proposed order is being submitted herewith.

Dated:    June 26, 2015               ROBERT THOMAS, et al.,
                                           Class Representative Plaintiffs

                                           */s/* Jeffrey A. Leon
                                           Jeffrey A. Leon
                                         Jamie E. Weiss
                                         Zachary A. Jacobs
                                       QUANTUM LEGAL LLC
                                         513 Central Avenue, Suite 300
                                         Highland Park, Illinois 60035
                                         (847) 433-4500

Richard J. Burke
QUANTUM LEGAL LLC
1010 Market Street, Suite 1310
St. Louis, MO 63101

Jonathan Shub
KOHN SWIFT AND GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700

*Attorneys for Plaintiffs and Proposed Classes*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that the following document:

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF THE CLASS SETTLEMENT**

was served on June 26, 2015, in accordance with FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Jeffrey A. Leon

Jeffrey A. Leon
